# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**WHITYNE A. FORT**                                                    **PLAINTIFF**

**v.**                          **Case No. 4:20-cv-00081-LPR**

**GRANT GARRETT EXCAVATING, INC.**                              **DEFENDANT**

## MEMORANDUM OF DECISION

On January 23, 2020, Plaintiff Whityne Fort sued her former employer, Grant Garrett Excavating, Inc. ("GGE"), under Title VII of the Civil Rights Act of 1964.[1]  Ms. Fort alleged that GGE terminated her because of her race.[2]  In April of 2022, the Court presided over a two-part bench trial in this case.[3]  On April 12, 2022, the Court heard evidence.[4]  On April 27, 2022, the Court heard legal argument.  Now, in accordance with Federal Rule of Civil Procedure 52(a), and after reviewing the parties' post-trial briefs as well as the entire trial record, the Court makes the following findings of fact and conclusions of law regarding Ms. Fort's claim.[5]

---

[1]  Compl. (Doc. 2).

[2]  *Id.*; Apr. 12, 2022 Tr. of Bench Trial at 4:21–25, 5:25–6:8.  In her Complaint, in addition to making a discriminatory-termination claim, Ms. Fort had (1) alleged that GGE retaliated against her for complaining to Human Resources about race discrimination, and (2) mentioned a claim under the Equal Pay Act.  Compl. (Doc. 2) at 2–3, 6.  At trial, Ms. Fort "narrowed her claims to two violations of Title VII"—namely, "unlawful termination on the basis of race discrimination and retaliation."  Pl.'s Proposed Findings of Fact and Conclusions of Law (Doc. 43) at 1.  After trial, Ms. Fort withdrew "her claim for retaliation and pursues only a single claim for unlawful termination under Title VII."  *Id.*

[3]  The Court appointed Blake Hendrix, a partner at Fuqua Campbell, PA, to represent Ms. Fort.  Mr. Hendrix and his staff have conducted themselves consistent with the best traditions and highest ideals of the legal profession.  Mr. Hendrix did a great service for his client, the judiciary, and opposing counsel.  The Court extends its gratitude to Mr. Hendrix and the law firm of Fuqua Campbell, PA.

[4]  The following witnesses provided testimony at trial: Sharia Davis, Whityne Fort, Justin McKenzie, and Gerald Gregory.  Apr. 12, 2022 Tr. of Bench Trial at 7, 133, 233, 251.  From June of 2018 until September of 2019, Sharia Davis served as the Human Resources Manager at GGE.  *Id.* at 8:17–24.  From December of 2017 until November 2, 2018, Ms. Fort worked in GGE's Human Resources Department and Trucking Division.  *Id.* at 134:25–135:3, 137:20–24, 157:6.  From late 2017 through the present, Justin McKenzie has worked for GGE.  *Id.* at 234:4.  Gerald Gregory is a co-owner of GGE and serves as GGE's Chief Operating Officer.  *Id.* at 251:21.  Mr. Gregory became a co-owner after the events that gave rise to this case.  *See id.* at 10:14–20.

[5]  In many instances, the witnesses in this case gave directly conflicting testimony.  To make matters more difficult, the parties introduced little documentary evidence to aid the Court in resolving the inconsistent testimony.  So the

## FINDINGS OF FACT

1.      GGE is an excavating company with approximately 200 employees.[6]

2.      Ms. Fort has a bachelor's degree.[7]  She has job experience in matters concerning the Department of Transportation, human resources, and office management.[8]  Ms. Fort also has a background in trucking.[9]

3.      In 2017, Ms. Fort applied for a job at GGE through a website—Indeed.com.[10]  After applying, Ms. Fort had a phone interview with Justin McKenzie, GGE's then-Human Resources ("HR") Director.[11]  Ms. Fort also had an in-person interview with Mr. McKenzie.[12]

### Winter 2017 Through Spring 2018

4.      On December 17, 2017, Ms. Fort joined GGE as an Executive HR Assistant making $15.00 per hour.[13]

---

Court must make a fair number of credibility determinations.  To make a credibility determination, the Court considers, among other things, (1) a witness's demeanor, (2) the internal consistency of the testimony, (3) the consistency of the testimony with pre-trial statements the witness made, (4) the consistency of the testimony with any other available evidence that the Court believes, (5) any motivations for dishonesty, and (6) a witness's general ability to recollect events.  In the Findings of Fact, the Court often explicitly notes testimony that the Court found not credible.  However, that is not always so.  Whether stated explicitly or not, where the Court makes a finding of fact and there is testimony inconsistent with that finding of fact, it should be understood that the Court has found the inconsistent testimony to be not credible or overcome by other testimony or evidence.

[6]  Apr. 12, 2022 Tr. of Bench Trial at 114:10.

[7]  *Id.* at 28:5–6.

[8]  *Id.* at 135:10–14.

[9]  *Id.* at 28:5–6.

[10]  *Id.* at 135:4–5.

[11]  *Id.* at 10:5–6; 135:5–6.

[12]  *Id.* at 135:6–9.

[13]  *Id.* 135:2–3, 23–25.  Ms. Fort testified that she did not get paid the rate "that [she] was supposed to start off with."  *Id.* at 135:25–136:1.  She says that Mr. McKenzie told her during the interview process that she would begin at $17.00 per hour.  *Id.* at 136:7–9.  Mr. McKenzie testified that Ms. Fort was hired at $15.00 per hour.  *Id.* at 234:5–10.  Mr. McKenzie testified that he never promised Ms. Fort the rate of $17.00 per hour.  *Id.* at 234:15–17.  Whether Ms. Fort was told a different starting pay than what she received is not material, so the Court need not resolve that discrepancy.

5.      At this time, Ms. Fort was the only Black female employee in the front office.[14]

6.      Mr. McKenzie, who is white, was Ms. Fort's initial supervisor.[15]

7.      Ms. Fort's duties as Executive HR Assistant included helping with "insurance, . . . onboarding, drug testing, background checks" and "pretty much" everything else in the HR department.[16]

8.      After ninety days on the job, Ms. Fort had a performance review.[17]   Mr. McKenzie said that Ms. Fort was "doing a great job" and gave Ms. Fort a $1.00 per hour raise.[18]

9.      At $16.00 per hour, Ms. Fort was slated to make about $32,000 per year.[19]

10.     In May of 2018, Gerald Gregory returned to GGE after a ten-month separation from the company.[20]  He came back as Chief Operating Officer.[21]

**Early Summer 2018**

11.     In June of 2018, Mr. McKenzie (then Ms. Fort's boss) gave Ms. Fort a verbal reprimand because Ms. Fort allowed a new truck driver to work without first passing a drug test.[22]  This first-time offense was not a terminable offense.[23]

---

[14]  *Id.* at 141:8–11.   Black employees comprise approximately 60% of GGE's workforce.  *Id.* at 116:15–16. Additionally, Gerald Gregory, who is now a co-owner of GGE, is Black.  Sharia Davis, who came on board with GGE's HR Department about six months after Ms. Fort, is also Black.

[15]  *Id.* at 10:5–7, 140:24–25, 141:6–7.

[16]  *Id.* at 138:2–8.

[17]  *Id.* at 137:7–8, 242:7–10.

[18]  *Id.* at 137:12–14; *see also id.* at 242:7–10.

[19]  For this calculation, the Court assumed a forty-hour workweek and that Ms. Fort would have worked fifty weeks per year.

[20]  *Id.* at 252:3–13.

[21]  *Id.* at 10:4–5.

[22]  *Id.* at 141:12–14, 245:5–11.

[23]  *Id.* at 246:16–17.

12.     Also in June of 2018, Sharia Davis began working for GGE as the HR Manager.[24] Ms. Davis became Ms. Fort's direct supervisor in the HR department.[25]  When Ms. Davis came on board, GGE began creating job descriptions for employees to sign.  Ms. Davis was tasked with this work.[26]  Ms. Davis is Black.

13.     In July of 2018, Ms. Fort was given duties in GGE's new Trucking Division.[27] This was in addition to her HR responsibilities.  Ms. Fort worked three days a week in HR and two days a week in the Trucking Division.[28]  Ms. Fort did not receive additional pay when she began working in the Trucking Division.[29]

14.     Jay Mathis was the Director of the Trucking Division and Ms. Fort's direct supervisor when she was working for that division.[30]  Ms. Fort's relationship with Mr. Mathis "was pleasant at first."[31]  Mr. Mathis is white.[32]

15.     One of Ms. Fort's roles within the Trucking Division was to help GGE get its Department of Transportation (DOT) files into compliance.[33]  Before Ms. Fort began working in

---

[24]  *Id.* at 8:17–18, 23–24.

[25]  *Id.* at 12:18–19.

[26]  *Id.* at 43:20–22; *see also id.* at 252:14–19 (Mr. Gregory testifying that he "tasked [Ms. Davis] with . . . building [GGE's] job descriptions").

[27]  *Id.* at 137:17–25.  It is more likely than not that Ms. Fort had already been unofficially performing some of the duties that were formally assigned to her in July of 2018.  *See id.* 137:20–21, 242:9–10.

[28]  *Id.* at 137:21–23.

[29]  *Id.* at 151:3–5.

[30]  *Id.* at 11:16, 140:14–20.

[31]  *Id.* at 145:4–7.

[32]  *Id.* at 141:4–5.

[33]  *Id.* at 138:13–14.  Ms. Fort testified that this was her main role.  *Id.*  But other evidence suggests that Ms. Fort's role was broader than just DOT compliance.  For instance, Mr. Gregory faulted Ms. Fort for primarily focusing on DOT compliance "when there w[ere] multiple facets related to" Ms. Fort's position.  *Id.* at 254:7–9.  Also, a job description presented to Ms. Fort indicates that Ms. Fort's role included DOT compliance along with many other duties.  Pl.'s Trial Ex. 4 at 1–2.  The Court finds that it is more likely than not that Ms. Fort had responsibilities beyond DOT compliance while she was in her Trucking Division role.

the Trucking Division, GGE had failed a DOT audit.[34]  As a result of Ms. Fort's involvement

with DOT issues, GGE's compliance rate went from zero to over ninety percent.[35]

16.    In late July of 2018, Ms. Fort had another problem related to drug testing

drivers.[36]  This time, Ms. Fort allowed a new driver to work despite having failed a drug test.[37]

Ms. Fort received a written warning, dated August 15, 2018, that listed the "TYPE OF

OFFENSE" as (1) "Violation of Company Policy," and (2) "Work Performance."[38]  Under a

section titled "Company remarks," the written warning stated, "Re: [S.M.] hired prior to drug

screen results—had to remove driver from [the] truck which is a DOT violation[—]worked for

two days prior to removal."[39]  This second offense (allowing a driver to work without passing a

drug test) could have resulted in Ms. Fort's termination.[40]  But neither Mr. Mathis nor anyone

else recommended that Ms. Fort be terminated for this offense.[41]

17.    After the second driver-drug-testing issue came to light, the relationship between

---

[34]  *Id.* at 139:10–23.

[35]  *Id.* at 140:7–13.

[36]  *Id.* at 141:22–142:11.

[37]  *Id.* at 142:5–11.  Ms. Fort testified that she discovered her own mistake and told Mr. Mathis and Ms. Davis that Ms. Fort had "dropped the ball." *Id.* at 143:20–24.  Ms. Fort testified that the driver never actually drove but was riding with another driver when Ms. Fort discovered the mistake. *Id.* at 142:5–11.  Ms. Davis testified, however, that she learned from Mr. Mathis that "he had a driver that did not pass the drug screen" and was working. *Id.* at 86:3–5.  Ms. Davis testified that she brought the mistake to Ms. Fort's attention. *Id.* at 54:7–11.  Ms. Davis further testified that "it took a couple of days, even a week for us to notice" this mistake. *Id.* at 126:2–3.  Ms. Davis's testimony is consistent with a draft of a letter that Ms. Davis wrote in response to Ms. Fort's EEOC charge. *See* Pl.'s Trial Ex. 10.  In that draft letter, Ms. Davis said that "we discovered that an error was made by Ms. Fort for not properly following the onboarding procedures." *Id.*  Given the consistency between Ms. Davis's testimony and her draft letter, as well as Ms. Fort's motivation to downplay this incident, the Court finds by a preponderance of the evidence that Ms. Fort did not bring this incident to her bosses' attention and that the driver actually drove.

[38]  Pl.'s Trial Ex. 12; *see also* Apr. 12, 2022 Tr. of Bench Trial at 141:22–142:2.

[39]  Pl.'s Trial Ex. 12.

[40]  Apr. 12, 2022 Tr. of Bench Trial at 87:24–88:7.

[41]  *Id.* at 88:4–7.

Ms. Fort and Mr. Mathis soured.[42]  In late July of 2018, Ms. Fort complained to Ms. Davis about how Mr. Mathis was treating Ms. Fort.[43]  Ms. Fort complained that Mr. Mathis "was just rude, flat out nasty, disrespectful, just snatching things out [of Ms. Fort's] hand."[44]  She also said that Mr. Mathis acted as if "he didn't want to be in the same room" with Ms. Fort.[45]

18.    Ms. Davis spoke with Mr. McKenzie about Mr. Mathis's attitude toward Ms. Fort.[46]  But by this time, Mr. McKenzie had moved from the HR Department to the Marketing Division.  He no longer handled HR matters.[47]

### Late Summer 2018

19.    In mid-August of 2018, Ms. Fort moved into the Trucking Division full time.[48]

20.    Ms. Fort continued complaining to Ms. Davis about Mr. Mathis's behavior.[49]

21.    Ms. Fort continually asked to move back to her HR role, but she "was told no."[50]

22.    Also around mid-August of 2018, Mr. Mathis approached Ms. Davis to discuss

---

[42] *Id.* at 145:7–9, 150:9–15.

[43] *Id.* at 15:21–23, 146:2–3.  Ms. Fort never testified that she mentioned race in any of her complaints about Mr. Mathis.  Ms. Davis never testified that Ms. Fort mentioned race as a factor in her complaints about Mr. Mathis. Ms. Fort did testify that "she let [Ms. Davis] know that [a driver] felt like . . . Jay had called him the N word." *Id.* at 148:24–149:1.  This is inadmissible hearsay.  Also, Ms. Fort "think[s]" that the driver told her this, but does not remember the driver's name.  *Id.* at 148:25.  So on top of this statement being hearsay, it is speculative as well.

[44] *Id.* at 146:25–147:2.

[45] *Id.* at 146:10–13.  At various times, Ms. Fort also complained that GGE did not increase Ms. Fort's pay to reflect the additional responsibilities she took on in the Trucking Division.  *See id.* at 13:14–21.

[46] *Id.* at 237:1–5.

[47] *Id.* at 237:3–6.  Ms. Fort testified that Mr. McKenzie met with Ms. Davis and Ms. Fort, and told Ms. Fort that Mr. Mathis was going through a nasty divorce and not to take Mr. Mathis's behavior personally.  *Id.* at 147:2–4. Mr. McKenzie testified that he never spoke with Ms. Fort about her issues with Mr. Mathis.  *Id.* at 237:1–8, 240:3–5.  The Court believes Mr. McKenzie, given that he was not involved in HR matters at this time.  The Court need not, however, decide whether Mr. McKenzie said this to Ms. Fort because it has no bearing on Ms. Fort's race-discrimination claim.  If anything, the alleged comment from Mr. McKenzie would indicate that Mr. Mathis's behavior toward Ms. Fort was a product of Mr. Mathis's difficulties on the home front as opposed to racial animus.

[48] *Id.* at 152:9–11.

[49] *Id.* at 150:13.

[50] *Id.* at 150:13–15.

hiring his friend, Cora Shepard.[51]  Ms. Shepard is white.[52]

23.  Ms. Shepard had transportation experience.  Ms. Shepard's parents owned a trucking company.[53]  She worked at Rineco Transportation, LLC.[54]  She started there in May of 2015 as a temporary worker making $14.00 per hour.[55]  About a year and a half later, she became a "DISPATCHER/PLANNER," making $50,000 per year.[56]

---

[51]  *Id.* at 16:10–21, 102:6–14.

[52]  *Id.* at 17:7–8.

[53]  *Id.* at 272:20.

[54]  *Id.* at 16:17–21; *see also* Pl.'s Trial Ex. 2 at 1, 6 (Ms. Shepard's resume listing Rineco Transportation, LLC as Ms. Shepard's employer from May of 2015 to October 15, 2018).

[55]  Pl.'s Trial Ex. 2 at 3; *see also* Apr. 12, 2022 Tr. of Bench Trial at 35:22–23.

[56]  Pl.'s Trial Ex. 2 at 6.  Ms. Davis testified that Ms. Shepard was not qualified to work in the Trucking Division. *See, e.g.*, Apr. 12, 2022 Tr. of Bench Trial at 27:2–3.  Ms. Davis said that Ms. Shepard "falsified" her qualifications.  *Id.* at 35:24–36:1.  The Court finds Ms. Davis not credible on this point.  Aside from inadmissible hearsay, Ms. Davis provided no support for her statement.  There is nothing else to contradict the veracity of Ms. Shepard's resume, which was introduced.  Moreover, the Court finds that a significant portion of Ms. Davis's testimony is at odds with earlier statements she had made.  And the inconsistent testimony is always in Ms. Fort's favor.  The inconsistencies leave the Court with the significant impression that Ms. Davis exaggerated or even made up parts of her testimony to help Ms. Fort and hurt GGE.  And, in the Court's view, this general conclusion greatly reduces the credibility of Ms. Davis on the issue of Ms. Shepard's qualifications.

Ms. Davis worked for GGE for approximately fifteen months.  *Id.* at 8:18–20.  Ms. Davis was terminated.  *Id.* at 9:11–12.  Upon her termination, Ms. Davis filed an EEOC complaint alleging that GGE retaliated and discriminated against her.  *Id.* at 66:1–5.  Ms. Davis then filed a lawsuit against GGE alleging race discrimination against GGE.  *Davis v. Grant Garrett Excavating, Inc.*, Case No. 4:21-cv-118-BSM (Doc. 2).  Judge Miller dismissed with prejudice Ms. Davis's lawsuit because it was untimely.  *Id.*, (Doc. 4) at 1–3.  Although Ms. Davis testified that she held "no animosit[y] towards GGE" for how she was treated there, her lawsuit strongly suggests otherwise.  Apr. 12, 2022 Tr. of Bench Trial at 67:11.  Ms. Davis's demeanor and off-hand comments about GGE during her testimony suggested to the Court that she had a personal ax to grind with GGE.  *See, e.g., id.* at 29:16–17 (Ms. Davis saying that GGE did "unethical things all of the time").  The Court thus looks with a jaundiced eye at Ms. Davis's testimony in general.

This is especially true because some of her testimony was clearly inconsistent with prior statements she made.  For example, the Court does not find credible Ms. Davis's testimony that Mr. Mathis made comments explicitly about Ms. Fort's skin color.  On direct examination, Ms. Davis first testified that Mr. Mathis commented once on Ms. Fort's wigs—saying that Ms. Fort "wore too many different color[ed] wigs."  *Id.* at 20:6–9.  Much later on in her testimony, she made new assertions.  She testified that Mr. Mathis "made comments about" Ms. Fort's "color, her complexion, and [the] color of her wigs."  *Id.* at 59:3–8.  She also testified to the Court that Mr. Mathis said that Ms. Fort "was too black to be wearing a purple wig."  *Id.* at 112:8–15.  Ms. Davis never mentioned these later assertions in any previous statements.  Ms. Davis made two statements regarding Ms. Fort's case after Ms. Davis was terminated.  *See* Def.'s Trial Exs. 13, 14.  In a sworn affidavit in this case, Ms. Davis said that Mr. Mathis did not "like all those different wigs and colors in [Ms. Fort's] hair."  Def.'s Trial Ex. 13 ¶ 19.  Ms. Davis did not mention skin color in that affidavit.  Similarly, in a September 17, 2019 witness statement to the EEOC, Ms. Davis mentioned Mr. Mathis's dislike of Ms. Fort's wigs.  Def.'s Trial Ex. 14 at 2.  Ms. Davis did not mention skin color in this witness statement.  When asked why she did not make mention of

24.     Mr. Mathis had worked with Ms. Shepard at Rineco before he joined GGE.[57]  Mr.
Mathis told Ms. Davis that he wanted Ms. Shepard to "come onboard" at GGE.[58]  Mr. Mathis
told Ms. Davis that GGE would need to offer Ms. Shepard a minimum of $50,000 per year to get
Ms. Shepard to move over to GGE.[59]

25.     Ms. Davis told Mr. Mathis that there was not an opening in the Trucking
Division.[60]  Mr. Mathis then told Ms. Davis that he wanted "to get rid of [Ms. Fort]."[61]  When
Ms. Davis asked Mr. Mathis if he had an issue with Ms. Fort's performance, Mr. Mathis told Ms.
Davis no.[62]  But Mr. Mathis did say that Ms. Fort "wore too many different color[ed] wigs."[63]
He also said that Ms. Shepard "was more lik[e]able" and "was a better fit than [Ms. Fort]."[64]

26.     Shortly after this initial discussion, Mr. Mathis again approached Ms. Davis and
requested that Ms. Davis go to lunch with Ms. Shepard.[65]  Ms. Davis again informed Mr. Mathis

---

skin color in her witness statement, Ms. Davis said that she "wrote down the things that [were] easy for [her] to remember until [she] got tired of writing."  Apr. 12, 2022 Tr. of Bench Trial at 110:8–9.  Ms. Davis's late-in-the-day testimony about Mr. Mathis commenting on Ms. Fort's skin color is not credible.  If Mr. Mathis did make those comments, surely Ms. Davis would have given such comments top billing and would not have left them out of her prior statements.

[57]  *Id.* at 16:17–19.

[58]  *Id.* at 17:17.

[59]  *Id.* at 19:16–18.

[60]  *Id.* at 17:17–18.

[61]  *Id.* at 17:18–19.

[62]  *Id.* at 20:1–3.

[63]  *Id.* at 20:6.  Ms. Davis testified that she told Mr. McKenzie and Mr. Gregory about Mr. Mathis's comment about Ms. Fort's wigs.  *Id.* at 20:10–15.  Mr. McKenzie testified that Ms. Davis never mentioned anything to him about that comment.  *Id.* at 237:11–21.  Mr. Gregory testified that Ms. Davis came to him in mid-September and told him about issues between Ms. Fort and Mr. Mathis.  *Id.* at 260:13–16.  Mr. Gregory said that Ms. Davis never mentioned Ms. Fort's hair color at that meeting.  *Id.* at 260:20–25.  Given the significant concerns that the Court has with Ms. Davis's credibility, *see, e.g.*, *supra* note 56, the Court does not believe that Ms. Davis relayed Mr. Mathis's comments about Ms. Fort's wigs to either Mr. McKenzie or Mr. Gregory.

[64]  Apr. 12, 2022 Tr. of Bench Trial at 17:22–24.

[65]  *Id.* at 21:6–7.

that there was no open position in the Trucking Division.[66]  Mr. Mathis became visibly agitated and told Ms. Davis that he "was going to go to Grant Garrett about getting Ms. Shepard onboard."[67]  Grant Garrett owned and ran GGE.[68]

27.     A few days later, Mr. Garrett came to Ms. Davis's office and inquired about Ms. Shepard.[69]  Mr. Garrett got upset with Ms. Davis and "demanded that [Ms. Davis] take the lunch meeting with [Ms. Shepard] and [Mr. Mathis]."[70]  Ms. Davis's position was that it was inappropriate to take the lunch meeting because there was no open role and because GGE could not afford the requested $50,000 salary for Ms. Shepard.[71]  However, as explained in paragraph 29, Ms. Davis ended up following Mr. Garrett's directive.

28.     Around this time, Mr. Mathis brought Ms. Shepard to Ms. Davis's office and asked Ms. Davis to interview Ms. Shepard.[72]  GGE's Office Manager, Cathy Logan, was present.[73]  Ms. Davis told Mr. Mathis that Ms. Shepard should not be hired.[74]  Mr. Mathis got very upset with Ms. Davis and told her that "he did not want [Ms. Fort]," and that "he was going to go to Grant Garrett to get [Ms. Shepard] hired."[75]

29.     Soon thereafter, Mr. Mathis, Ms. Shepard, and Ms. Davis went to lunch.[76]  During the lunch meeting, Mr. Mathis did much of the talking, trying to sell Ms. Davis on the idea of

---

[66] *Id.* at 22:2.

[67] *Id.* at 22:4–5.

[68] *Id.* at 10:4, 10–13.

[69] *Id.* at 23:22–24.

[70] *Id.* at 24:7–9.

[71] *Id.* at 24:12–18.

[72] *Id.* at 24:25–25:8.

[73] *Id.* at 20:21–23, 25:5–6.

[74] *Id.* at 25:17–19.

[75] *Id.* at 25:20–23.

[76] *Id.* at 26:4–5.

hiring Ms. Shepard.[77]  After the lunch meeting, Mr. Garrett came to Ms. Davis's office to discuss the lunch meeting.[78]  Ms. Davis told Mr. Garrett that Ms. Shepard was not qualified.[79]  Mr. Garrett asked Ms. Davis, "[H]ow did [Ms. Shepard] look[?]"[80]

### Fall 2018

30.    About a week after this meeting—very close to September of 2018—Mr. Garrett came to Ms. Davis's office and asked, "Why [is Ms. Fort] still here[?]"[81]  Mr. Garrett then told Ms. Davis that he was going to take a lunch meeting with Ms. Shepard.[82]  Ms. Davis reminded Mr. Garrett that Ms. Shepard was asking for $50,000 per year.[83]  Mr. Garrett said that GGE might be able to handle that salary request depending on how Ms. Shepard looked.[84]  Ms. Davis again told Mr. Garrett that, in her opinion, Ms. Shepard was not qualified.[85]

31.    Mr. Garrett went to lunch with Ms. Shepard.[86]  When he returned to the office, he met with Ms. Davis and told her to fire Ms. Fort.[87]  Mr. Garrett told Ms. Davis to offer Ms. Fort

---

[77] *Id.* at 26:5–8.  Ms. Davis testified that Ms. Shepard did not say a single word during the entire lunch meeting.  *Id.* at 26:4–5.  Even after the Court gave Ms. Davis an opportunity to soften her position, Ms. Davis repeated that Ms. Shepard did not say a word during the lunch meeting.  *Id.* at 26:10–14.  This is another instance where Ms. Davis was either exaggerating or being less than honest with the Court.  In her witness statement to the EEOC, Ms. Davis said that Ms. Shepard "didn't say much" at the lunch meeting.  Def.'s Trial Ex. 14 at 3.  Ms. Davis's prior inconsistent statement with respect to this lunch adds to the Court's overall skepticism of Ms. Davis's testimony.  In addition to the inconsistency, the Court's common sense and general experience in the world make it impossible to believe that a person interested in a job (like Ms. Shepard) would say absolutely nothing to someone in Ms. Davis's position at a lunch designed to get Ms. Shepard hired.

[78] *Id.* at 26:18–23.

[79] *Id.* at 26:23–25.

[80] *Id.*

[81] *Id.* at 27:19–20.

[82] *Id.* at 27:20–23.

[83] *Id.* at 27:25–28:1.

[84] *Id.* at 28:1–2.

[85] *Id.* at 28:3–8.

[86] *Id.* at 28:17–18.

[87] *Id.* at 28:17–20.  Ms. Davis testified that Mr. Garrett said some problematic things at this meeting.  *Id.* at 60:4–12.  Ms. Davis said that Mr. Garrett commented on Ms. Shepard's appearance, including her breasts.  *Id.*  Ms.

a "severance of two weeks" and have Ms. Fort sign a non-disclosure agreement.[88]  Ms. Davis advised against having Ms. Fort sign a non-disclosure agreement.[89]  Ms. Davis told Mr. Garrett that making Ms. Fort sign a non-disclosure agreement would make GGE look guilty.[90]  Mr. Garrett agreed and told Ms. Davis to just fire Ms. Fort.[91]

32.     From September through October of 2018, Mr. Garrett repeatedly asked Ms. Davis why Ms. Fort was still at GGE.[92]  Ms. Davis told Mr. Garrett that she did not feel comfortable firing Ms. Fort without cause.[93]  Instead, Ms. Davis believed that Mr. Mathis should be the one to fire Ms. Fort.[94]

33.     At some point in early September of 2018, Ms. Davis brought Ms. Fort's issues with Mr. Mathis to Mr. Gregory's attention.[95]  Mr. Gregory then met with Mr. Mathis regarding the situation between Mr. Mathis and Ms. Fort.[96]  Mr. Mathis told Mr. Gregory that the problem between the two was a lack of communication and Ms. Fort's singular focus on the "DOT

---

Davis testified that she then told Mr. Garrett that Ms. Shepard "may be a blond, but she doesn't have the qualifications." *Id.* at 60:10–11.  Ms. Davis said that Mr. Garrett responded, "[Ms. Fort's] [B]lack ass don't either." *Id.* at 60:11–12.  The Court has already discussed Ms. Davis's credibility issues *supra* notes 56, 63, 77.  This is another instance where the Court finds Ms. Davis to lack credibility.  In her affidavit in this case and in her September 27, 2019 witness statement to the EEOC, Ms. Davis never mentioned Mr. Garrett using racial language in reference to Ms. Fort.  *See* Def.'s Trial Exs. 13, 14.  Had Mr. Garrett done so, there is no reason in the world that Ms. Davis would have forgotten to include such charged comments in her prior statements.  With respect to the gender-related comments, the Court concludes that Ms. Davis is generally credible that Mr. Garrett commented on Ms. Shepard's appearance.  Ms. Davis has consistently made such assertions in all of her statements.  However, the Court concludes that Ms. Davis may be exaggerating the language of these comments.  She did not attribute such language to Mr. Garrett in her prior statements.  And the Court does not find her excuse for not doing so credible—the excuse being that she was worried about Mr. Garrett's marriage and reputation.  Apr. 12, 2022 Tr. of Bench Trial at 60:6–7.

[88]   *Id.* at 29:12–14.

[89]   *Id.* at 29:17–23.

[90]   *Id.*

[91]   *Id.* at 30:2.

[92]   *Id.* at 30:3–6.

[93]   *Id.* at 30:9–10.

[94]   *Id.* at 30:10–12.

[95]   *Id.* at 103:22–24, 260:15–16.

[96]   *Id.* at 264:23–25.

component of trucking."[97]  Mr. Mathis told Mr. Gregory that he wanted Ms. Fort to focus on

"other things related to trucking" like "[d]ispatching, collecting tickets, [and] filing the weight

information related to trucking."[98]

34.    On September 12, 2018, Ms. Davis, at Mr. Gregory's request, finalized a job

description for the role of Logistic Coordinator.[99]  On or around that same day, Ms. Davis gave

the job description to Ms. Fort for her review and signature.[100]  Ms. Fort had not previously

signed a job description when she began in HR or when she transitioned to the Trucking

---

[97]  *Id.* at 264:13–16.

[98]  *Id.* at 264:18–20.

[99]  *Id.* at 37:13–23, 38:6–7; *see also* Pl.'s Trial Ex. 4.  Ms. Davis testified that the creation of this job description was "part of [a] plan that if [Ms. Fort] did not accept and sign [the job description], [then GGE] would use [it] against [Ms. Fort] to term[inate] her."  Apr. 12, 2022 Tr. of Bench Trial at 38:10–12.  Ms. Davis said that she knows this because she attended several meetings in which other managers discussed "how to term[inate Ms. Fort] without being looked at as [if GGE was] discriminating against [Ms. Fort]."  *Id.* at 39:21–40:3.  The Court does not find credible Ms. Davis's testimony about the existence and operation of such a conspiracy.  Ms. Davis did not mention GGE using a job description as a contrived basis to terminate Ms. Fort in her affidavit or EEOC witness statement.  *See* Def.'s Trial Exs. 13, 14.  Also, the Court finds it more likely than not that the alleged meetings where the conspiracy was supposedly hatched did not happen.  Ms. Davis testified that Mr. McKenzie attended a meeting where Mr. Gregory came up with the job-description plan.  Apr. 12, 2022 Tr. of Bench Trial at 41:18–25.  Mr. McKenzie testified that he never attended any meeting involving Ms. Fort's termination.  *Id.* at 243:7–9.  The Court credits Mr. McKenzie's testimony over Ms. Davis's testimony for a few reasons.  Ms. Davis's general credibility is very low.  *See supra* notes 56, 63, 77, 87.  The Court also finds it unlikely that Mr. McKenzie, who was in the Marketing Division at the time the job description was given to Ms. Fort, would be involved in an HR issue with Ms. Fort.  Finally, the alleged conspiracy plan is unimaginably stupid.  Ms. Fort could have easily thwarted "the plan" simply by signing the job description.  The Court finds it more likely than not that GGE did not give Ms. Fort this job description as a ruse to terminate her.

Ms. Davis testified that she took notes throughout her time at GGE, including notes related to meetings in which Ms. Fort's termination was discussed.  Apr. 12, 2022 Tr. of Bench Trial at 104:10–17.  No such notes have been admitted into evidence.  Ms. Davis testified that she did not retain any of these notes because Mr. Gregory "snatched them" out of Ms. Davis's hand when Ms. Davis was fired.  *Id.* at 104:19–21.  This assertion (similar to another bizarre assertion about a separate post-termination stand-off between Ms. Davis and Mr. Gregory) is hard to believe.  *Id.* at 92:2–93:24.  Prior to trial, Ms. Davis did not mention (in her EEOC witness statement or affidavit) Mr. Gregory taking her notes.  *See* Def.'s Trial Exs. 13, 14.  The Court finds it more likely than not that Mr. Gregory did not take Ms. Davis's notes.  If there are no notes, it is most likely because Ms. Davis did not create them.  If there are notes, the fact that either Ms. Davis did not share them or the Plaintiff did not seek to introduce them speaks volumes.

[100]  Apr. 12, 2022 Tr. of Bench Trial at 153:11–17, 192:7–14, 195:20–25.  Ms. Fort testified that she received the job description in October of 2018.  *Id.* at 153:14–19.  The job description is dated September 12, 2018.  Pl.'s Trial Ex. 4.  Moreover, Mr. Gregory testified that Ms. Fort brought the job description with her when she met with him on October 1, 2018.  *Id.* at 255:2–256:9.  The documentary evidence and Mr. Gregory's (rare albeit appreciated) specificity with respect to the date he and Ms. Fort met about the job description leads the Court to conclude that it is more likely than not that Ms. Fort received the job description in mid-September of 2018.

Division.[101]  Ms. Fort was not initially given a deadline to sign the job description.[102]

35.    On September 27, 2018, GGE sent Ms. Shepard an offer letter for a job at GGE.[103]  Ms. Davis prepared the letter.[104]  The letter mentioned two job titles.[105]  The second paragraph of the letter mentioned the position of Assistant Transportation Manager.[106]  The bottom of the letter, however, said, "I hereby accept the Logistic Administrative Assistant Position . . . ."[107]  This discrepancy is understandable.  Ms. Davis's original draft letter had titled the position Logistic Administrative Assistant, but Mr. Gregory told Ms. Davis to change Ms. Shepard's title to Assistant Transportation Manager.[108]  Ms. Davis made the change in the second paragraph of the letter, but she forgot to make the change at the bottom of the letter.[109]

36.    Ms. Shepard accepted the job on or around September 27, 2018.[110]

37.    On October 1, 2018, Ms. Fort emailed Mr. Gregory and asked if he had time to meet.[111]  Mr. Gregory immediately responded, telling Ms. Fort he was available right away.[112]  The two met about fifteen minutes later.[113]  At the meeting, Ms. Fort told Mr. Gregory that she had concerns about the difference between the job description she received and the duties she

---

[101] Apr. 12, 2022 Tr. of Bench Trial at 153:24–25, 154:21–155:5.

[102] *Id.* at 193:14–19.

[103] *Id.* at 30:13–15; *see also* Pl.'s Trial Ex. 1.

[104] Apr. 12, 2022 Tr. of Bench Trial at 31:1–3.

[105] Pl.'s Trial Ex. 1.

[106] *Id.*

[107] *Id.*

[108] Apr. 12, 2022 Tr. of Bench Trial at 32:15–25.

[109] *Id.* at 32:23–25.

[110] *Id.* at 33:4–8.

[111] *Id.* at 255:3–4, 256:8–9.

[112] *Id.* at 255:3–4.

[113] *Id.* at 256:8–10.

was then performing.[114]  Mr. Gregory told Ms. Fort that he knew she had the job description "for several weeks" and that he needed Ms. Fort to "modify it, red line it, [and] review it."[115]  Mr. Gregory then told Ms. Fort that the two would meet at the end of the week to go over her revisions.[116]

38.    On October 5, 2018, Mr. Gregory went to Ms. Fort's office to check on her progress with the job description.[117]  Ms. Fort told Mr. Gregory that she still "hadn't addressed it."[118]  Mr. Gregory then told Ms. Fort that he needed her "to do this because [she was] infringing upon insubordination . . . ."[119]  Ms. Fort never modified or signed the job description.

39.    About a week later, Mr. Mathis told Mr. Gregory that Mr. Mathis "still had complaints" about Ms. Fort.[120]  Mr. Gregory told Mr. Mathis to make a decision about whether to fire Ms. Fort.[121]  Mr. Mathis then told Mr. Gregory that Mr. Mathis was "going to relieve [Ms. Fort] of her duties."[122]

40.    On October 15, 2018, and after already accepting a position at GGE, Ms. Shepard formally submitted an employment application.[123]  On the application, Ms. Shepard indicated that she was currently employed at Rineco Transportation making $50,000 as a "dispatch[er]/planner."[124]  Ms. Shepard wrote that she was available to work beginning on

---

[114] *Id.* at 255:8–9.

[115] *Id.* at 255:10–13.

[116] *Id.* at 255:12–13.

[117] *Id.* at 255:14–16.

[118] *Id.* at 255:16.

[119] *Id.* at 255:16–18.

[120] *Id.* at 258:18–19.

[121] *Id.* at 258:19.

[122] *Id.* at 258:25.

[123] *Id.* at 33:9–17; *see also* Pl.'s Trial Ex. 2.

[124] Pl.'s Trial Ex. 2 at 3.

November 5, 2018.[125]

41.    In late October of 2018—again, after Ms. Shepard had already been hired—Ms. Davis posted an employment advertisement on Indeed.com.[126]   The advertisement listed the available job as "Logistic Coordinator."[127] Over 200 people responded to the Indeed advertisement.[128]   GGE did not contact any of those people about the advertised position.[129]

42.    Ms. Fort received an Indeed notification on her phone about the recently posted Logistic Coordinator position.[130]   Ms. Fort testified that the advertised position was the "same job description" she had previously been asked to review and sign.[131]   She called Ms. Davis and asked her, "[W]hat's going on[?]"[132]   Ms. Davis told Ms. Fort that GGE was looking to get her some help.[133]   Ms. Davis knew this was a lie.[134]

43.    On October 31, 2018, GGE finalized a job description for Ms. Shepard.[135]   Ms. Shepard's job description was titled Assistant Transportation Manager, but it was very similar to the Logistic Coordinator job description that Ms. Fort had been asked to sign.[136]   Both job descriptions are three pages long.[137]   Except for the formal names of the positions, the

---

[125] *Id.* at 1.

[126] Apr. 12, 2022 Tr. of Bench Trial at 45:7–25.

[127] *Id.* at 45:20–22; *see also* Pl.'s Trial Ex. 7.

[128] Apr. 12, 2022 Tr. of Bench Trial at 50:25–51:1.

[129] *Id.* at 51:2–5.

[130] *Id.* at 155:23, 156:8.

[131] *Id.* at 155:23–25.

[132] *Id.* at 47:4–5, 156:1–2.

[133] *Id.* at 47:5–8.

[134] *Id.* at 47:6–10.

[135] Pl.'s Trial Ex. 6.

[136] *Compare id.*, *with* Pl.'s Trial Ex. 4.

[137] Pl.'s Trial Ex. 4 at 1–3; Pl.'s Trial Ex. 6 at 1–3.

introductory paragraphs in both descriptions are identical.[138]   Both job descriptions have a

section titled "Qualifications Requirements."[139]   Except for the formal names of the positions,

these sections are identical.[140]   Both job descriptions have a section titled "Essential Duties And

Responsibilities."[141]   The Logistic Coordinator job description lists thirty-two duties and

responsibilities.[142]   The Assistant Transportation Manager description lists the same thirty-two

duties and responsibilities.[143]   There are, however, six additional duties and responsibilities set

out in the Assistant Transportation Manager description.[144]   The respective last pages of the two

job descriptions are nearly identical as well.[145]

44.     On the afternoon of November 2, 2018, Mr. Mathis called Ms. Fort into his

office.[146]   Mr. Mathis terminated Ms. Fort.[147]   Mr. Mathis told Ms. Fort that GGE "was going in

a different direction and [Ms. Fort] wasn't part of that new direction."[148]   Mr. Mathis did not

---

[138] Pl.'s Trial Ex. 4 at 1; Pl.'s Trial Ex. 6 at 1.

[139] Pl.'s Trial Ex. 4 at 1; Pl.'s Trial Ex. 6 at 1.

[140] Pl.'s Trial Ex. 4 at 1; Pl.'s Trial Ex. 6 at 1.

[141] Pl.'s Trial Ex. 4 at 1; Pl.'s Trial Ex. 6 at 1.

[142] Pl.'s Trial Ex. 4 at 1–2.

[143] *Compare id.*, *with* Pl.'s Trial Ex. 6 at 1–2.

[144] Pl.'s Trial Ex. 6 at 1–2.  These additional duties and responsibilities are: (1) "[d]ispatch SPT and contract trucks," (2) "[p]ut in parts and repair orders in JJ Keller Maintenance, prepare spreadsheet and report to Trucking Manager and Asst. Manager for approval," (3) "[a]ssist with parts and vendor," (4) "[c]omplete[] overweight permits," (5) "[m]inor reports to Trucking Manager or Truck Push Supervisor," and (6) "[w]ork closely with the Truck Pusher Supervisor." *Id.*

[145] Pl.'s Trial Ex. 4 at 3; Pl.'s Trial Ex. 6 at 3.  The only difference at all appears at the beginning of the first sentence on each page.  The first sentence on page three of the Logistic Coordinator job description says, "Logistic Coordinator is responsible . . . ."  Pl.'s Trial Ex. 4 at 3.  The first sentence on page three of the Assistant Transportation Manager job description says, "Assistant Transportation Manager is responsible . . . ."  Pl.'s Trial Ex. 6 at 3.  After the word "responsible," the language is identical.  Pl.'s Trial Ex. 4 at 3; Pl.'s Trial Ex. 6 at 3.  The third page of both job descriptions lists the same "Education and Training" requirements and the same "Physical Demands and Abilities" requisites.  Pl.'s Trial Ex. 4 at 3; Pl.'s Trial Ex. 6 at 3.

[146] Apr. 12, 2022 Tr. of Bench Trial at 157:6–12.

[147] *Id.* at 157:6, 274:17–20.

[148] *Id.* at 157:13–16.

provide Ms. Fort with any other reason for her termination.[149]  When Ms. Fort asked Mr. Mathis

who fired her, Mr. Mathis first said that Ms. Davis fired Ms. Fort.[150]  Mr. Mathis then told Ms.

Fort that Mr. McKenzie made the firing decision.[151]  Mr. Mathis finally told Ms. Fort that

"someone up there in the front office" fired Ms. Fort.[152]  However, Mr. Mathis actually made the

decision to terminate Ms. Fort.[153]  A few days later, Ms. Fort reached out to Ms. Davis and other

GGE employees to find out why she had been let go.[154]  No one gave her a reason for her

termination.

    45.    On November 5, 2018 (the Monday following Ms. Fort's termination), Ms.

Shepard assumed her role at GGE.[155]  For all intents and purposes, Ms. Shepard replaced Ms.

Fort.  Mr. Gregory testified about Ms. Shepard's tenure at GGE: "She [is] probably the best

trucking person [the company has] had [in] the seven years [that Mr. Gregory had] been

associated with [the company].  She's the best one.  She communicate[s] with the truckers well.

She [is] able to schedule trucks.  [There] wasn't a time that we were short on trucks.  The DOT

was in compliance.  She handled the safety issues.  She was a rock star in trucking.  She panned

out to be a rock star in trucking."[156]

---

[149] *Id.* at 158:12–16.

[150] *Id.* at 157:18–19.

[151] *Id.*

[152] *Id.* at 157:20–21.

[153] *Id.* at 274:17–20.

[154] *Id.* 157:23–25.

[155] *See* Pl.'s Trial Ex. 2 at 1 (showing Ms. Shepard's available start date as November 5, 2018).

[156] Apr. 12, 2022 Tr. of Bench Trial at 280:10–19.

**2019**

46.     On March 1, 2019, Ms. Fort filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) against GGE.[157]   On March 7, 2019, the EEOC informed GGE of Ms. Fort's charge.[158]

47.     On March 12, 2019, Ms. Davis prepared a portion of a draft response to the EEOC regarding Ms. Fort's EEOC charge.[159]   The portion that Ms. Davis prepared stated in relevant part:

> On/or about 8/15/18, our company investigated drivers' records.   During this investigation, we discovered that an error was made by Ms. Fort for not properly following the onboarding procedures.   The investigation [included] information pertaining to a CDL-driver only known as S.M. [who] was interviewed, hired and employed for our trucking division SPT under the [direction] of Ms. Fort.   We[] discovered while auditing files that driver S.M. worked as an employee of GGE for two consecutive days with an unapproved authorization[.][160]

48.     After Ms. Davis prepared her portion of the draft response, she gave it to Mr. Gregory and Mr. Mathis for them to write a statement.[161]   Ms. Davis never saw the completed draft response, and she never saw any official company response to the EEOC.[162]

49.     Ms. Fort testified that, in its official response to her EEOC charge, GGE claimed that Ms. Fort's termination was based on her failure to sign the job description.[163]   The trial

---

[157] Pl.'s Trial Ex. 9 at 5.

[158] *Id.* at 1.

[159] Pl.'s Trial Ex. 10; Apr. 12, 2022 Tr. of Bench Trial at 53:9–12.

[160] Pl.'s Trial Ex. 10; Apr. 12, 2022 Tr. of Bench Trial at 53:16–24, 54:3–17.

[161] Apr. 12, 2022 Tr. of Bench Trial at 54:12–17.

[162] *Id.*

[163] *Id.* at 159:21–160:5.   Neither party introduced into evidence GGE's actual response to the EEOC regarding Ms. Fort's discrimination charge.   The parties appear to assume that the draft response bearing Ms. Davis's signature was the official response and that GGE offered only one reason (the second driver-drug-test issue) for Ms. Fort's termination.   But that can't be.   Ms. Davis testified that she handed her portion of the draft response over to Mr. Gregory and Mr. Mathis.   *Id.* at 54:12–14.   After that point, Ms. Davis never saw the draft response or any other response to the EEOC charge.   She thus has no personal knowledge of the actual response GGE filed with the

record does not include any finalized statement from GGE to the EEOC.

50.     According to Mr. Gregory, Ms. Fort was terminated for a "litany" of reasons.[164]

Mr. Gregory testified that Ms. Fort's failures relating to the drug testing of drivers raised red

flags and gave GGE "visibility that there was a problem . . . ."[165]   But ultimately, according to

Mr. Gregory, Ms. Fort's termination was based on (1) Ms. Fort's failure to complete the job

description, which he characterized as insubordination, and (2) Ms. Fort's failure to

communicate with Mr. Mathis.[166]

---

EEOC.  Ms. Davis further testified that Mr. Gregory and Mr. Mathis needed to write statements about the EEOC charge.  *Id.*  After that, according to Ms. Davis, GGE "needed to submit" all that information to a law office that was representing GGE at the time.  *Id.* at 54:14–16.  Mr. Gregory denied that the driver-drug-test issue Ms. Davis discussed in the draft response was the sole issue GGE raised in its response.  *Id.* at 268:24–269:2.  And Ms. Fort testified that GGE's response to the EEOC discussed the failure-to-sign-the-job-description issue.  *Id.* at 159:21–160:5.  Given all of this, the Court finds it more likely than not that GGE, through an outside law firm, told the EEOC that Ms. Fort's termination was based, at least in part, on the failure-to-sign-the-job-description issue.

[164] *Id.* at 259:14–17.

[165] *Id.* at 259:20–22.

[166] *Id.* at 260:1–3.  Although the Court has significant concerns about its relevance, for purposes of fullness the Court includes findings related to one further incident in September of 2019.

Ms. Davis conducted a new-hire orientation with a group of employees that included Black and Hispanic individuals.  *Id.* at 61:19–62:18.  During the orientation, Ms. Davis took the new hires on a tour of GGE's facility.  *Id.* at 62:6–12.  While Ms. Davis was escorting the new hires from a new addition to GGE's building to GGE's shop, she came across Mr. Garrett.  *Id.* at 63:2–10.  Mr. Garrett stopped Ms. Davis and asked her what she was doing.  *Id.* at 63:11.  Ms. Davis told Mr. Garrett that she was conducting a new-hire orientation.  *Id.* at 63:11–13.  Mr. Garrett "looked over there at the group and he said, ['W]hy are you showing them around[?']" *Id.* at 63:13–15.  Mr. Garrett then said, "They look like thieves and robbers.  All they are go[ing to] do is come back and steal from me."  *Id.* at 63:15–16; *see also* Pl.'s Trial Ex. 11.  One of the new hires, a Black man, quit and told Ms. Davis that he "did not want to work for a company like this."  Apr. 12, 2022 Tr. of Bench Trial at 64:15–64:16.  Ms. Davis reported this incident to Mr. Gregory.  *Id.* at 64:17–18, 276:18–21.  Shortly after this incident, GGE terminated Ms. Davis.  *Id.* at 8:19–20, 66:20–22.

Ms. Davis testified that Mr. Gregory told Ms. Davis to use Mr. Garrett's conduct in front of the new hires as leverage against Mr. Garrett.  *Id.* at 65:13–14.  Ms. Davis further testified that Mr. Gregory said that (1) "[Grant] treats everybody like a fucking slave around here anyway," and (2) "Grant runs this company like it's a fucking plantation, [a] slave plantation."  *Id.* at 61:1–2, 65:15–16.  Mr. Gregory denied saying any of this.  *Id.* at 278:7–15.  Given Ms. Davis's penchant for embellishment, the Court does not believe that Mr. Gregory made these comments.  In any event, these statements allegedly occurred almost a year after Ms. Fort was terminated and, as such, are of very little relevance to the question of whether Mr. Mathis considered Ms. Fort's race when he terminated her.

## CONCLUSIONS OF LAW

Ms. Fort alleges that GGE fired her based on her race in violation of Title VII of the Civil Rights Act of 1964.  Ms. Fort has presented no direct evidence of discrimination. The parties both contend that this case should thus be decided using the *McDonnell Douglas* burden-shifting framework.[167]  The Court is not sure that the *McDonnell Douglas* framework is appropriate at the trial stage—even for a bench trial.  There is competing caselaw on the matter.[168]  And to be frank, the Court is most persuaded by the cases that suggest the *McDonnell Douglas* framework is not appropriate at trial.  But, based on the parties' agreement and because the outcome is the same under both analytical frameworks, the Court will apply the *McDonnell Douglas* framework here.

Under *McDonnell Douglas*, Ms. Fort bears the initial "burden to establish a prima facie case of discrimination."[169]  "A prima facie case creates a rebuttable presumption of discrimination."[170]  If Ms. Fort makes out a prima facie case, the "burden then shifts to [GGE] to

---

[167] *See, e.g.*, *Jones v. City of St. Louis*, 825 F.3d 476, 480 (8th Cir. 2016) (applying the burden-shifting framework of *McDonnell Douglas* because plaintiff presented no direct evidence of discrimination); *see also* Apr. 27, 2022 Tr. of Bench Trial (Rough) at 2:17–19 (counsel for Ms. Fort saying that, "when we deal with circumstantial evidence in Title VII cases, we then utilize th[e] burden shifting analysis of the *McDonnell Douglas* case"); *id.* at 35:21–36:6 (counsel for GGE acknowledging that, "even at this stage," courts use the *McDonnell Douglas* burden-shifting framework).

[168] *Compare U.S. Postal Serv. Bd. of Governers v. Aikens*, 460 U.S. 711, 713–14 (1983) ("Because this case was fully tried on the merits, it is surprising to find the parties . . . still addressing the question whether [plaintiff] made out a *prima facie* case."), *Bowen v. Celotex Corp.*, 292 F.3d 565, 566 (8th Cir. 2002) (noting that a plaintiff's failure to make a prima facie case cannot be the basis for a factfinder's Title VII verdict), *and Genochio v. Barnhart*, No. 3:03-CV-10127-CFB, 2005 WL 2839980, at *7 (S.D. Iowa August 23, 2005) (noting that because the case was fully tried in a bench trial, the proper question was not whether plaintiff established her prima facie case, but whether plaintiff had proved her claim by a preponderance of the evidence), *with Adams v. Nolan*, 962 F.2d 791, 794 (8th Cir. 1992) (applying *McDonnell Douglas* framework to review of a bench trial), *and Arnold v. LTV Missiles & Elecs. Grp., Missile Div.*, 45 F.3d 433 (8th Cir. 1994) (unpublished) (noting that district court properly analyzed the case under *McDonnell Douglas*).

[169] *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 (8th Cir. 2010).

[170] *Id.*

provide a legitimate, nondiscriminatory reason for its decision."[171]   If GGE does so, "'the presumption raised by the prima facie case is rebutted,' and 'drops from the case.'"[172]   Ms. Fort then has "'the full and fair opportunity to demonstrate,' through presentation of [her] own case and through cross-examination of [GGE's] witnesses, 'that the proffered reason was not the true reason for [Ms. Fort's termination],' and that race was."[173]

## I.   Ms. Fort's Prima Facie Case

To make out a prima facie case, Ms. Fort "must show that (1) she is a member of a protected group; (2) she was qualified for her position; (3) she was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination."[174]   Ms. Fort clearly satisfies the first and third elements of her prima facie case.   No one disputes that Ms. Fort is Black.[175]   Nor does anyone dispute that Ms. Fort was fired from her role on November 2, 2018.[176]   The second and fourth elements, however, require a slightly more detailed analysis.

---

[171] *Id.*

[172] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal citations omitted) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 & n.10 (1981)).

[173] *Hicks*, 509 U.S. at 507–08 (internal citations omitted) (quoting *Burdine*, 450 U.S. at 256).

[174] *Elam v. Regions Fin. Corp.*, 601 F.3d 873, 879 (8th Cir. 2010) (quotation marks and citation omitted).   There appears to be some conflict in the Eighth Circuit with respect to the proper prima facie standard in Title VII cases.   *Compare Elam*, 601 F.3d at 879, *with Carter v. Pulaski Cnty. Special Sch. Dist.*, 956 F.3d 1055, 1058 (8th Cir. 2020) (stating a prima facie case is established if the plaintiff shows that "(1) she is a member of a protected class, (2) she met her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)" (internal quotations marks and citations omitted)).   Both *Elam* and *Carter* involved discharge discrimination claims under Title VII, and the Eighth Circuit has not explained whether these differing standards apply in different contexts.   It may be worth resolving this tension or providing guidance as to what circumstances dictate using one standard instead of the other.   Because the *Elam* standard is more plaintiff-friendly, the Court will use it.   In any event, whether Ms. Fort established a prima facie case does not change the outcome of the Court's decision here because, on this trial record, the Court does not conclude that GGE's nondiscriminatory reasons for terminating Ms. Fort were pretext for racial discrimination.

[175] Apr. 12, 2022 Tr. of Bench Trial at 141:8–11.

[176] *Id.* at 157:6–12.

With respect to the second element, Ms. Fort must show that she was "qualified for her position . . . ."[177]  There is something of a conflict in the Eighth Circuit precedent concerning whether Ms. Fort must, as part of this prima facie element, show that she was meeting all of GGE's legitimate work expectations.[178]  If so, that would likely require the Court to evaluate GGE's reasons for firing Ms. Fort.  But that evaluation is supposed to occur later, at the "legitimate, nondiscriminatory reasons" and "pretext for discrimination" stages of the analysis. The more plaintiff-friendly (and less redundant) approach to the second element of a prima facie case only requires Ms. Fort to show that, setting aside GGE's reasons for firing her, she was otherwise qualified and meeting GGE's expectations.   Under this formulation, Ms. Fort was qualified for her position at GGE.  Ms. Fort has a bachelor's degree, a background in trucking, and job experience in matters concerning the Department of Transportation, human resources, and office management.[179]  Further, aside from GGE's proffered reasons for her firing, Ms. Fort was otherwise meeting GGE's expectations.   Before the second driver-drug-test incident and subsequent events, Ms. Fort received a good performance review and raise,[180] greatly improved GGE's DOT compliance,[181] and had a pleasant relationship with her direct supervisor in Trucking, Mr. Mathis.[182]  Ms. Fort has satisfied the second element of her prima facie case.

---

[177] *Elam*, 601 F.3d at 879.

[178] *Compare Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994) (explaining that it was improper to require plaintiff to show that she was meeting her employers legitimate work expectations because it required plaintiff to prove pretext and the ultimate issue of discrimination at the prima facie stage), *and Lake*, 596 F.3d at 874 (setting aside the employer's reasons for firing plaintiff and determining whether plaintiff was "*otherwise* meeting expectations or *otherwise* qualified"), *with Richmond v. Bd. of Regents of Univ. of Minn.*, 957 F.2d 595, 598 (8th Cir. 1992) (considering defendants' reasons for termination when evaluating whether plaintiff was qualified).

[179] Apr. 12, 2022 Tr. of Bench Trial at 28:5–6, 135:10–14.

[180] *Id.* at 137:12–14, 242:7–10.

[181] *Id.* at 140:7–13.

[182] *Id.* at 145:4–7.

The fourth element requires that Ms. Fort show that the discharge occurred under circumstances giving rise to an inference of discrimination.[183]  One way Ms. Fort can do this is to show that, "after h[er] discharge, [s]he was replaced by a person with similar qualifications."[184]  Further, "proof of replacement by a person outside the protected class will satisfy the fourth element . . . ."[185]  Ms. Fort was effectively replaced by Ms. Shepard, a white woman with generally similar qualifications.  Thus, Ms. Fort has satisfied the fourth and final element and has successfully made out her prima facie case.

## II.   GGE's Legitimate, Nondiscriminatory Reasons for Ms. Fort's Termination

Because Ms. Fort made out a prima facie case, the burden shifts to GGE to provide a legitimate, nondiscriminatory reason for its decision.[186]  Insubordination and violation of company policy are legitimate, nondiscriminatory reasons for termination.[187]  So is failure to appropriately communicate with one's supervisor.  Mr. Gregory (then COO and now co-owner of GGE) testified that (1) Ms. Fort's repeat violations of company policy with respect to the drug testing of drivers raised red flags, and (2) ultimately Ms. Fort's termination was based on her insubordination (the failure to complete and sign the job description form) and her failure to communicate with her direct supervisor, Mr. Mathis.[188]  In short, GGE has provided multiple legitimate, nondiscriminatory reasons for Ms. Fort's termination that are sufficient to satisfy GGE's burden of production.

---

[183] *Elam*, 601 F.3d at 879.

[184] *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003).

[185] *Davenport*, 30 F.3d at 944.

[186] *Elam*, 601 F.3d at 879.

[187] *See, e.g., Moyer v. DVA Renal Healthcare, Inc.*, 368 F. App'x 714, 717 (8th Cir. 2010) (collecting cases).

[188] Apr. 12, 2022 Tr. of Bench Trial at 259:14–17, 20–22.

### III.    Pretext For Discrimination

Because GGE provided legitimate, nondiscriminatory reasons for its decision, "'the presumption raised by the prima facie case [has been] rebutted,' and 'drops from the case.'"[189] Ms. Fort then has "'the full and fair opportunity to demonstrate,' through the presentation of [her] own case and through cross-examination of [GGE's] witnesses, 'that the proffered reason was not the true reason for [Ms. Fort's termination],' and that race was."[190]   Ms. Fort may demonstrate pretext, "among other ways, by showing that [GGE] (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."[191]

But, critically in this case, it is not enough that Ms. Fort demonstrate that GGE's reasons are pretext generally.  Instead, she must prove by a preponderance of the evidence that GGE's reasons are pretext *for race discrimination*.[192]   That is, she must prove by a preponderance of the evidence that her termination was, at least in part, due to her race.  In some cases, proving pretext as a general matter is enough to allow a factfinder to infer that the real reason (or a real reason) for a termination was race.  The Court explicitly acknowledges that, as the factfinder here, it could draw such a conclusion.  However, proving pretext alone does not require a factfinder to conclude that the pretext was to hide racial discrimination.  That is because companies can engage in pretextual terminations (i.e., withholding the real reason or reasons for the termination) for all sorts of different reasons—some illegal and some not.  It's never good to engage in such conduct, but it does not always mean the real reasons for the termination were race-based, in

---

[189] *Hicks*, 509 U.S. at 507 (internal citations omitted) (quoting *Burdine*, 450 U.S. at 255 & n.10).

[190] *Id.* at 507–08 (internal citations omitted) (quoting *Burdine*, 450 U.S. at 256).

[191] *Lake*, 596 F.3d at 874.

[192] *Hicks*, 509 U.S. at 515 ("[A] reason cannot be proved to be a 'pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.").

whole or part.

Ms. Fort says that GGE's justifications for her termination were and are pretextual because they were and are "shifting and inconsistent."[193]  Ms. Fort also notes that GGE did not follow normal hiring procedures when it hired Ms. Shepard.[194]  Ms. Fort is correct that GGE's explanations for her termination were and are inconsistent.  And she is correct that GGE did not follow normal hiring procedures with respect to Ms. Shepard.

Even though Mr. Mathis made the decision to fire Ms. Fort, Mr. Mathis told Ms. Fort that several other people made the decision.  First, he said that Ms. Davis (Ms. Fort's last supervisor when Ms. Fort was in HR) fired Ms. Fort.  Then he said that Mr. McKenzie (Ms. Fort's first supervisor when Ms. Fort was in HR) fired Ms. Fort.  Finally, he said that "someone up there in the front office" fired Ms. Fort.[195]  As to why she was fired, Mr. Mathis told Ms. Fort that GGE

---

[193] Pl.'s Proposed Findings of Fact and Conclusions of Law (Doc. 43) at 15–18. To succeed on this argument, Ms. Fort must show that the alleged inconsistencies are not minor discrepancies or supplements, but are completely different and substantial variations. *See Gardner v. Wal-Mart Stores, Inc.*, 2 F.4th 745, 750 (8th Cir. 2021).

[194] Pl.'s Proposed Findings of Fact and Conclusions of Law (Doc. 43) at 19–20; *see Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1126–27 (8th Cir. 2017) ("Evidence showing an employer has failed to follow its own policies may indicate pretext, yet '[a]n employer can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee . . . as long as it does not unlawfully discriminate in doing so.'" (citation omitted)).

While not raised in her briefing, Ms. Fort appeared to make a third argument for pretext during her testimony. That argument was that GGE treated similarly-situated employees in a disparate manner.  She testified that she was "paid less than all of [her] white counterparts." Apr. 12, 2022 Tr. of Bench Trial at 184:7–8.  This comparison is not helpful to Ms. Fort because her claim is that she was fired, not that she was paid less than other employees.  Ms. Fort also provided two examples where a GGE employee was not disciplined for misconduct. *Id.* at 189:18–190:7.  But the employees in these scenarios were in a different position than Ms. Fort and committed violations entirely different than the ones Ms. Fort committed.  Ms. Fort next testified that other drivers have been allowed to drive after failing a drug test, but no one involved was reprimanded.  *Id.* at 191:23–192:4.  Ms. Fort's statement alone, without providing any of the specific facts of these scenarios, is insufficient to enable the Court to make any comparison to Ms. Fort's situation.  Finally, Ms. Fort testified that "[t]here have been several mistakes made at [GGE], and no one's been fired."  *Id.* at 177:24–25.  The Court finds this statement very hard to believe, especially considering the multiple termination forms submitted into evidence by GGE.  Def.'s Trial Ex. 9.  Overall, the Court does not find that any of this testimony adequately demonstrates that similarly-situated employees were treated differently than Ms. Fort.  But even if the Court did make such a finding, Ms. Fort would be unable to make the necessary leap from pretext to pretext for discrimination for the reasons discussed *infra* pp. 26–30.

[195] Apr. 12, 2022 Tr. of Bench Trial at 157:18–21.

was "going in a different direction and [Ms. Fort] wasn't part of that new direction."[196]   GGE apparently told the EEOC that Ms. Fort was terminated because of her failure to properly and timely drug test truck drivers and (at least in part) her failure to complete and sign the job description.[197]   Mr. Gregory testified that, while the driver-drug-test issues gave GGE "visibility that there was a problem," Ms. Fort was ultimately fired because of (1) Ms. Fort's failure to complete the job description, and (2) Ms. Fort's failure to communicate with Mr. Mathis.[198] These shifting explanations of who fired Ms. Fort and why make it more likely than not that none of these explanations is the true reason (or only reason) for Ms. Fort's firing.

With respect to the hiring procedures GGE followed when bringing aboard Ms. Shepard, they were far from normal.  Ms. Shepard accepted the role,[199] then submitted a job application,[200] and then GGE posted a public advertisement for the role.[201]   These steps are the complete reverse of what one would expect.  All in all, Ms. Fort is correct that the circumstances of Ms. Shepard's hiring as well as the varying explanations given for Ms. Fort's firing suggest pretext.[202]

Ms. Fort fails, however, to prove pretext for discrimination.   To be clear, the Court concludes that (1) Ms. Fort has shown it is more likely than not that the reasons given by GGE for her termination were pretextual, but (2) she has not shown that it is more likely than not that the real reason (or a real reason) for the termination was her race.  There is nothing to show that

---

[196] *Id.* at 157:13–16.

[197] *See supra* note 163.

[198] Apr. 12, 2022 Tr. of Bench Trial at 259:20–22, 260:1–3.

[199] *Id.* at 33:4–6.

[200] *Id.* at 33:9–17; *see also* Pl.'s Trial Ex. 2.

[201] Apr. 12, 2022 Tr. of Bench Trial at 45:7–25.

[202] Obviously, the conclusion of pretext is a mark against the credibility of GGE's witnesses.  The Court has already factored this "mark" into its various determinations (both express and implied) concerning competing witness testimony and competing witness credibility issues.  To be plain about it, everyone in this case is fibbing a little bit, but the Court still has to figure out who is fibbing the most on each particular issue.

GGE's inconsistent termination explanations and abnormal hiring procedures are pretext for, or evince, race discrimination. Instead, the far more likely explanation on this trial record is that GGE terminated Ms. Fort in order to make room for a former colleague and friend of Mr. Mathis. That may be bad business. That may be morally objectionable. But it is not unlawful race discrimination, and the effort to hide it doesn't transform it into unlawful race discrimination.

Ms. Fort tries to support the inferential leap between pretext and pretext for discrimination by highlighting some of Mr. Garrett's and Mr. Mathis's workplace statements and conduct. Recall at that time Mr. Garrett was the sole owner of GGE and Mr. Mathis was Ms. Fort's direct supervisor. Let's start with Mr. Garrett. Ms. Fort emphasizes Mr. Garrett's agreement with Ms. Davis's suggestion not to require Ms. Fort to sign a non-disclosure agreement because doing so would make GGE look guilty. Ms. Fort says this shows Mr. Garrett was trying to hide race discrimination.[203] But that leap is speculative in the extreme. The decision not to require a non-disclosure agreement could just as easily indicate that Mr. Garrett did not want to give the *incorrect* impression that GGE was doing something wrong. Further, even if Mr. Garrett's actions evinced a guilty mind, it is not at all clear that it was race discrimination (as opposed to some other wrong) that he was trying to hide.

Although it wasn't raised in the legal arguments, it is important to also consider Mr. Garrett's statement that GGE might hire Ms. Shepard (and might be able to handle Ms. Shepard's high salary request) depending on how she looked.[204] Skin color is certainly part of how someone looks. But the Court concludes that, here, it is more likely than not that Mr.

---

[203] *Id.* at 29:12–19, 30:2; Apr. 27, 2022 Tr. of Bench Trial at 17:11–18:6.

[204] Apr. 12, 2022 Tr. of Bench Trial at 28:1–2.

Garrett was referring to how attractive Ms. Shepard was generally rather than to the color of her skin.  There is nothing to suggest that Mr. Garrett thought Black women were not attractive, or were less attractive than white women.[205]

Ms. Shepard also argues that several of Mr. Mathis's statements are indicative of discrimination.  First, she says that Mr. Mathis's negative comment about her wigs suggests that he was motivated to fire her because of her race.[206]  The connection between not liking someone's wigs and not liking someone's race is tenuous.  In any event, on this trial record, it is more likely that Mr. Mathis has a problem with employees wearing multiple different colored wigs generally, regardless of their skin color.

Second, Ms. Fort says that Mr. Mathis's statements that Ms. Shepard was "more lik[e]able" and a "better fit" were a proxy for race discrimination.[207]  In the overall circumstances of this case, the Court finds that, more likely than not, these statements were made in a race-neutral manner.  While "likeability" and "fit" can certainly be subterfuge for racial discrimination, they can also be perfectly normal reasons to prefer someone for employment.  And this trial record reveals that there are significant, plausible, non-race related reasons that Mr. Mathis thought Ms. Shepard was more likeable and was a better fit than Ms. Fort.

To start, unlike his souring relationship with Ms. Fort, Mr. Mathis had a positive relationship and friendship with Ms. Shepard.[208]  He had previously worked with her at another transportation company.  Also, Ms. Shepard had several years of experience working primarily

---

[205] The Court does not mean to say that hiring based on attractiveness is appropriate or lawful.  The point is that it is not necessarily (and is not in this case) race discrimination.  In this trial, the Court is only evaluating a racial discrimination claim.  The Court does not have before it, for example, a sex discrimination claim.

[206] *Id.* at 20:6; Apr. 27, 2022 Tr. of Bench Trial at 7:3–10.

[207] Apr. 12, 2022 Tr. of Bench Trial at 17:22–24; Apr. 27, 2022 Tr. of Bench Trial at 44:8–9.

[208] Apr. 12, 2022 Tr. of Bench Trial at 16:19–21, 102:6–14, 145:7–9, 150:9–15.

in trucking.[209]  Ms. Fort, on the other hand, although she had some experience in trucking, was initially hired into an HR role and had only just been switched over to a full-time Trucking role when Mr. Mathis started lobbying to hire Ms. Shepard.[210]  Further, Ms. Shepard's former role was as a Dispatcher, which was an aspect of trucking that Mr. Mathis complained that Ms. Fort did not focus on enough.[211]  Finally, Ms. Fort made several trucking-related snafus that certainly impacted his confidence in her abilities, even if they weren't the definitive reason for her firing—for example, the multiple driver-drug-test incidents.  All things considered, Mr. Mathis's friendship with Ms. Shepard and greater confidence in her abilities are likely what he was referring to when he said she was a better fit.  And, with the benefit of hindsight, Mr. Mathis appears to have been right.  According to Mr. Gregory, Ms. Shepard "[is] probably the best trucking person [the company has] had . . . .  She panned out to be a rock star in trucking."[212]

Overall, rather than not wanting a Black person in the role, the most likely reason Ms. Fort was fired was that Mr. Mathis was dead set on hiring his friend Ms. Shepard, and GGE wanted to keep Mr. Mathis happy.  Mr. Mathis and Mr. Garrett hounded Ms. Davis to bring Ms. Shepard onboard.  And Ms. Davis made clear there wasn't an open spot for Ms. Shepard because Ms. Fort was working that job.  So that meant Ms. Fort had to be fired if Mr. Garrett and Mr. Mathis wanted to make space for Ms. Shepard.  This explanation of events is far more consistent with all of the evidence than any other explanation is.

Despite Ms. Davis's steadfast objections to hiring Ms. Shepard, Mr. Garrett and Mr. Mathis never mentioned another name or course of action.  If they just wanted to replace Ms.

---

[209] Pl.'s Trial Ex. 2 at 3, 6.

[210] Apr. 12, 2022 Tr. of Bench Trial at 16:19–21, 102:6–14, 135:2–3, 152:9–11.

[211] *Id.* at 264:18–20; Pl.'s Trial Ex. 2 at 3, 6.

[212] *Id.* at 280:12–19.

Fort with a white person, they could have opened applications generally and hired any white person at a salary similar to Ms. Fort's salary.  Or they could have fired Ms. Fort after the second driver-drug-test issue, when they had just cause to fire her but before Ms. Shepard entered the picture.  However, Mr. Mathis and Mr. Garrett insisted on hiring Ms. Shepard specifically and were willing to pay her significantly more money than Ms. Fort in order to do so.  This, coupled with the fact that Ms. Fort's firing only came up once Ms. Shepard entered the picture, suggests that it was Mr. Mathis's unique connection with Ms. Shepard, rather than any alleged discriminatory animus toward Ms. Fort, that solely motivated GGE's staffing decision here.

Ultimately, while the explanations GGE has provided for Ms. Fort's termination seem pretextual, Ms. Fort has not proved by a preponderance of the evidence that they are pretext for race discrimination.  Instead, the explanations seem like pretext for GGE's desire to keep Mr. Mathis happy by hiring his friend and someone he could work well with.  Because this reason was more related to personal connections than to Ms. Fort's quality of work, GGE likely felt it needed to conceal its motivation with pretextual justifications. Even if it is bad business or morally questionable, firing someone in order to hire a friend is not race discrimination.  As such, Ms. Fort has not proved that GGE's nondiscriminatory reasons for terminating her were pretext for racial discrimination.  Ms. Fort's race was not a factor at all in her termination.

## IV.    Alternative Framework

As noted above, even though the parties agree that the *McDonnell Douglas* framework applies here, the Court is concerned that this framework is inappropriate for a bench trial like this one.  While some Courts have used *McDonell Douglas*, others have bypassed the burden-shifting framework and merely asked whether the plaintiff has proved her discrimination claim by a

preponderance of the evidence.[213]   But even if the Court applied that standard, Ms. Fort would still not prevail.   The Court found above that Ms. Fort made out her prima facie case and that the reasons GGE provided for firing her were false.[214]   Thus, there is minimal difference between the question the Court ultimately had to answer above—whether Ms. Fort showed that GGE's reasons were pretext for race discrimination—and the question the Court answers here—whether Ms. Fort showed that race motivated (or better said, was a motivating factor in) GGE's decision.[215]   For all the reasons discussed above, the Court does not find that Ms. Fort proved by a preponderance of the evidence that race played any role in her firing.[216]   Instead, the Court finds that her firing was solely motivated by Mr. Mathis's desire to hire his friend, Ms. Shepard, and GGE's desire to keep Mr. Mathis happy.

## CONCLUSION

For the foregoing reasons, judgment will be entered in favor of Grant Garrett Excavating, Inc.

IT IS SO ORDERED this 6th day of February 2023.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[213] *See supra* note 168.

[214] *See* discussion *supra* Conclusions of Law, Sections I–III.

[215] *See* 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a *motivating factor* for any employment practice, even though other factors also motivated the practice." (emphasis added)); *see also* Eighth Cir. Model Civ. Inst. 5.21 (2021) ("As used in these instructions, the plaintiff's [race] was a 'motivating factor,' if the plaintiff's [race] played a part (or a role) in the defendant's decision to [terminate] the plaintiff.  However, the plaintiff's [race] need not have been the only reason for the defendant's decision to [terminate] the plaintiff.").

[216] *See* discussion *supra* Conclusions of Law, Section III.